[Cite as *Miller v. Ohio Dept. of Rehab. & Corr.*, 2013-Ohio-3629.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

GISELE MILLER

      Plaintiff

      v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

      Defendant

Case No. 2011-13141

Magistrate Holly True Shaver

<u>DECISION OF THE MAGISTRATE</u>

{¶ 1} Plaintiff brought this action alleging employment discrimination. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} On May 10, 2010, plaintiff began her employment with defendant as a Corrections Officer (CO) at Noble Correctional Institution (NCI). Plaintiff was subject to a one-year probationary period. During her probationary period, plaintiff received on-the-job training and had the opportunity to work every shift and CO position throughout the institution.

{¶ 3} Plaintiff's performance was first evaluated on July 18, 2010. During that evaluation, under the dimension titled "Dealing with Demanding Situations" it was noted that "Miller is new and has had no emergency situations yet." (Defendant's Exhibit N.) However, plaintiff met all of the goals that were expected of her, and her overall evaluation was rated "satisfactory." Plaintiff's performance was evaluated a second time on November 18, 2010. (Defendant's Exhibit B.) During that evaluation, it was noted that "Miller seems to understand the importance of boundaries between inmates and officers but has not been in a situation to apply the reasonable risk factor." It was

also noted that "Miller needs to work on her communication of the rules and expectations to inmates. In regards to the fact of inmates running around during such times as count time and lock down [sic]. Miller needs to show more control of the inmates assigned to her." Finally, under the goal titled "Makes prudent and sound decisions and takes appropriate action to diffuse problem situations," it was noted that the rater had "not observed this officer in a problem situation." Plaintiff remained on probation.

{¶ 4} On January 24, 2011, plaintiff's performance was evaluated again. As a result of this evaluation, plaintiff's employment was terminated effective February 3, 2011. The basis for termination was reflected in reports from incidents that had occurred on December 3, 2010, December 24, 2010, and January 19, 2011. The reports allege that plaintiff had panicked while she was working in the control room, and that she had responded inappropriately to corrections officers' requests for assistance during fights between inmates.

{¶ 5} Plaintiff asserts that defendant terminated her employment on the basis of her gender in violation of R.C. Chapter 4112.

{¶ 6} R.C. 4112.02 provides, in pertinent part, that: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 7} In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196 (1981).

{¶ 8} Absent direct evidence of discriminatory intent, Ohio courts resolve claims of disparate treatment using the evidentiary framework established by the Supreme

Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Canady v. Rekau & Rekau, Inc.*, 10th Dist. No. 09AP-32, 2009-Ohio-4974, ¶ 22. "Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination. In order to do so, the plaintiff must present evidence that: (1) [she] is a member of a protected class, (2) [she] suffered an adverse employment action, (3) [she] was qualified for the position in question, and (4) either [she] was replaced by someone outside the protected class or a non-protected similarly situated person was treated better." *Id.* at ¶ 23.

{¶ 9} If plaintiff establishes a prima facie case, the burden of production shifts to defendant to "articulate some legitimate, nondiscriminatory reason for [its action.]" *McDonnell Douglas*, *supra*, at 802. If defendant succeeds in doing so, then the burden shifts back to plaintiff to prove that the legitimate, nondiscriminatory reasons offered by defendant were a mere pretext for discrimination. *Id.* The court must determine either: "'(1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the discharge, or (3) that the proffered reason was insufficient to motivate the discharge.'" *Owens v. Boulevard Motel Corp.*, 10th Dist. No. 97APE12-1728 (Nov. 5, 1998), quoting *Frantz v. Beechmont Pet Hosp.*, 117 Ohio App.3d 351, 359 (1st Dist.1996).

{¶ 10} It is undisputed that plaintiff, as a female, is a member of a protected class, and that she suffered an adverse employment action. Defendant asserts that plaintiff was not qualified for the position because she failed to respond appropriately to critical situations as noted in the incident reports.

{¶ 11} "The prima facie burden of showing that a plaintiff is qualified can be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Saha v. Ohio State Univ.,* 10th

Dist. No. 10AP-1139, 2011-Ohio-3824, ¶ 49, citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-576 (6th Cir.2003).

{¶ 12} Captain Todd Mugrage testified that he interviewed plaintiff for the position and that plaintiff had obtained a masters' degree and was educated as a counselor. It is not disputed that plaintiff met the minimum requirements to become a CO subject to completing a probationary period. Therefore, the court finds that plaintiff was qualified for the position of a probationary CO.

{¶ 13} With regard to the fourth element of a prima facie case, plaintiff did not present any evidence to show that she was replaced by someone outside the protected class. Plaintiff argued that defendant treated a non-protected, similarly-situated person more favorably. To support this assertion, plaintiff testified that Captain Mugrage told her that when he first started his career he had "panicked" while working in the control room, but that his employment was not terminated. However, plaintiff gave no specific details about that incident, and when Captain Mugrage testified, he stated that it would be "speculation" to state that he had panicked in the control room.

{¶ 14} In order to establish a prima facie case of discrimination based upon treatment of comparables, a plaintiff must show that the other persons referenced were comparable in all respects. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992). A "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated'; rather, * * * the plaintiff and the employee with whom the plaintiff seeks to compare [herself] * * * must be similar in 'all of the relevant aspects.' The individuals with whom the plaintiff seeks to compare * * * [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (Citations omitted.) *Clark v. City of Dublin,* 10th Dist. No. 01AP-458, 2002-Ohio-1440, ¶ 23.

{¶ 15} Upon review of the evidence, the court finds that plaintiff's attempt to use Captain Mugrage as a comparable employee fails. First, plaintiff failed to identify who Captain Mugrage's supervisor was when he allegedly panicked. Second, plaintiff failed to prove that Captain Mugrage was a probationary employee when he allegedly panicked. Third, even if Captain Mugrage had panicked, the stated reason for plaintiff's termination included not only panicking in the control room but also failing to assist another officer during a fight. The court finds that Captain Mugrage and plaintiff did not engage in the same conduct.

{¶ 16} Plaintiff also testified that another male CO with whom she was working had gotten upset during a "shakedown" and had acted inappropriately by destroying inmates' property. However, plaintiff could not identify the CO, and she admitted that she did not report his conduct to a supervisor. Plaintiff also failed to establish whether the unidentified CO was a probationary employee and who supervised him. Upon review of the evidence, the court finds that the conduct of destroying inmate property is not similar in nature to panicking in the control room and failing to assist another officer during a fight. As such, the court finds that plaintiff has failed to prove that either Captain Mugrage or the unidentified male CO was a similarly situated employee. Therefore, the court finds that plaintiff has failed to establish a prima facie case of employment discrimination.

{¶ 17} Assuming, arguendo, that plaintiff had established a prima facie case of discrimination, defendant has articulated a legitimate, nondiscriminatory reason for terminating her employment: that she was unable to successfully carry out the duties and responsibilities of a CO, as documented in the incident reports from December 3, 2010, December 24, 2010, and January 19, 2011. Plaintiff asserts that defendant's proffered reasons have no basis in fact. Therefore, the court shall address the incidents as noted in the reports individually.

## I. DECEMBER 3, 2010 INCIDENT

{¶ 18} Lieutenant Elbert Rose testified that he was working in the segregation unit performing rounds when he heard a scream come across the radio about a fight in one of the dormitories. Lt. Rose ran to the sally port, but after making multiple requests to open the door, it did not open. When plaintiff had finally pushed the button to open the door, the situation in the dormitory had concluded. In Lt. Rose's opinion, with eight months of on-the-job training, plaintiff should have been capable of performing all of the required tasks in the control room. Lt. Rose explained that the equipment in the control room is configured so that one officer can perform multiple tasks. Lt. Rose opined that plaintiff did not possess the good judgment necessary to be a CO and that she failed to make decisions under stress.

{¶ 19} Lieutenant Scott Randolph testified that he was performing rounds when he heard a panicked voice screaming over the radio. Lt. Randolph stated that when someone panics over the radio, everyone assumes the worst is happening. Lt. Randolph testified that he heard Lt. Rose order plaintiff to open the segregation door at least three times before she opened it. Lt. Randolph opined that plaintiff did not possess the judgment required for a CO.

{¶ 20} Plaintiff testified that she was working in the control room when a report of a fight came across the radio. Plaintiff denied that she panicked, and testified that she responded immediately and appropriately to obtain escorts for two fighters. Plaintiff added that it does not "make sense" that she would panic in such a situation.

## II. DECEMBER 24, 2010 INCIDENT

{¶ 21} CO Sharon Graham testified that she was working in the control room with plaintiff; that she was taking inventory of the keys and that plaintiff was assigned to the radio; and that when a call regarding a fight came through, plaintiff "sat there and did nothing." CO Graham intervened to call for assistance and announced that there was a

fight in the "pit."  Plaintiff then corrected CO Graham to say that the fight was in the gym.  CO Graham testified that at the time of the incident, she wondered why plaintiff had not made the call herself if she knew where the fight was.  CO Graham testified that as a result of this incident, she lost trust in plaintiff and felt that she could no longer count on plaintiff to come to her aid.

{¶ 22} According to plaintiff, she was working in the control room when a call came across the radio.  Plaintiff did not hear what was said initially.  When plaintiff turned to respond, CO Graham intervened and announced that there was a fight in the "pit."  However, the fight was actually occurring in the gym.  According to plaintiff, the other employees in the control room were socializing; she was the only one doing anything work-related; and she assumed no one else heard the radio because no one else responded.

## III.  JANUARY 19, 2011 INCIDENT

{¶ 23} CO Jared McGilton testified that CO Cavendish called for assistance with a fight in progress in the "B-2" dormitory.  CO McGilton described the B-2 dormitory at NCI as an open bay with racks of metal bunk beds for 120 inmates.  CO McGilton stated that each dormitory officer is issued a hand-held radio, a set of keys, and a set of hand restraints.  After CO Cavendish called for assistance, CO McGilton ran to the East Bay in B-2 and saw two inmates fighting:  one inmate was on the ground and another was near the wall but not obeying verbal commands to stay on the wall.  CO McGilton observed that plaintiff was not keeping the inmate on the wall and that she was slowly moving away from the scene.  CO McGilton intervened and placed his hands on the inmate.  CO McGilton felt that the situation was not under control and he told plaintiff to place hand restraints on the inmate.  CO McGilton testified that he spoke to plaintiff afterwards but felt that she did not understand the severity of what had happened.

{¶ 24} CO Timothy Johnson testified that he responded to a call for assistance and observed CO McGilton telling plaintiff to "cuff" the inmate who was coming off the

wall. CO Johnson witnessed plaintiff backing away from the situation. CO Johnson stated that each CO has only one set of handcuffs, and that plaintiff should have been using her handcuffs on the inmate who was on the wall since CO Cavendish had placed his handcuffs on the inmate who was on the floor. CO Johnson described plaintiff as appearing "startled" and that she was five or six feet away from CO Cavendish. CO Johnson testified that plaintiff's inaction had placed another officer in jeopardy.

{¶ 25} According to plaintiff, she was assigned as a "relief officer" that day and was not aware that she should have been carrying handcuffs. While she was working with CO Cavendish in a dormitory, a fight occurred. According to plaintiff, CO Cavendish got between the two fighting inmates and subdued one of them on the floor. Plaintiff asserted that she took the other inmate to the wall. However, she admitted that she did not have handcuffs to place on the inmate. CO McGilton and another CO rushed in to assist. According to plaintiff, CO McGilton yelled at her and threw his handcuffs to her so that she could cuff the inmate on the wall. Plaintiff testified that she felt that she had been assisting CO Cavendish adequately and that he was never "in harm's way." Plaintiff disputes CO McGilton and CO Johnson's accounts of the incident because they arrived after the inmates had stopped fighting. Plaintiff opined that the absence of an incident report from CO Cavendish shows that CO McGilton and CO Johnson's accounts lack credibility.

{¶ 26} As a result of the events described in the incident reports, Captain B.J. Wilson recommended that plaintiff be removed from her probationary period and that her employment be terminated. Wilson testified that when he had observed plaintiff working in the dormitory, the inmates were very loud. Wilson stated that he relied on his own observations and the recommendation of Lt. Rose and other lieutenants to remove plaintiff from her probationary employment. Wilson testified that plaintiff did not interact with inmates, that she lacked control over inmates, and described her as "lazy." Wilson did not doubt the truthfulness or accuracy of plaintiff's final evaluation.

{¶ 27} According to plaintiff, in December 2010, she felt that both Lt. Rose and CO McGilton began to treat her differently.  Plaintiff testified that she felt she was qualified to be a CO and that she never got any negative feedback from anyone except Lt. Rose and CO McGilton.  Plaintiff testified that she felt that Lt. Rose and CO McGilton took a dislike to her and they worked together to catch her doing something wrong so that her probation could be terminated.

{¶ 28} The court finds that the greater weight of the evidence shows that the incidents that were reported did, in fact, occur.  Although plaintiff testified that she felt that Lt. Rose and CO McGilton treated her "differently," the greater weight of the evidence shows that plaintiff failed to respond in a timely or appropriate manner in critical situations.  Specifically, the testimony of Lt. Rose, Lt. Randolph, CO Graham, CO McGilton, CO Johnson, and Captain Wilson was more credible than plaintiff's with regard to the incidents that led to her termination. In the final analysis, the court finds that plaintiff has failed to prove by a preponderance of the evidence that the legitimate, nondiscriminatory reasons offered by defendant were a pretext for discrimination.

{¶ 29} Lastly, plaintiff elicited the testimony of Jody Beardmore, labor relations officer at NCI, who stated that from January 1, 2008 to the date of trial, 12 of 66 male probationary employees had been terminated from employment, while 4 of 13 female probationary employees had been terminated from employment.  Plaintiff argues that a greater percentage of female employees at NCI are removed from probationary employment.  The court notes that plaintiff did not assert a claim for disparate impact discrimination in her complaint.  "Disparate impact discrimination involves employment practices that are facially neutral in their treatment of different groups but fall more harshly on one group. * * * In a disparate impact case, a plaintiff must begin by identifying the specific employment practice that is challenged and that is allegedly responsible for any observed statistical disparity. * * * 'Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question

has caused' the alleged discrimination."  (Internal citations omitted.)  *Albaugh v. City of Columbus, Division of Police*, 10th Dist. No. 02AP-687, 2003-Ohio-1328, ¶ 11.

{¶ 30} Upon review of the evidence, the court finds that plaintiff has failed to both identify any specific employment practice that is allegedly responsible for any statistical disparity and to offer sufficient statistical evidence to show that the practice has caused any discrimination.

{¶ 31} For the foregoing reasons, the court finds that plaintiff has failed to prove any of her claims by a preponderance of the evidence and, accordingly, judgment is recommended in favor of defendant.

{¶ 32} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).  If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.  A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

cc:

Emily M. Simmons                    Louis J. Carlozzi
Assistant Attorney General          1382 West 9th Street, Suite 215
150 East Gay Street, 18th Floor     Cleveland, Ohio 44113
Columbus, Ohio 43215-3130

002

Filed March 8, 2013
To S.C. Reporter August 22, 2013